IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JACK ROGERS and PAUL PINELLA, | : | CIVIL ACTION |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | NO. 07-218 |
| | : | |
| COMCAST CORPORATION, et al. , | : | |
| | : | |
| Defendants. | : | |

_____

| | | |
|---|---|---|
| MARTH KRISTIAN, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | NO. 07-219 |
| | : | |
| COMCAST CORPORATION, et al. , | : | |
| | : | |
| Defendants. | : | |

_____

**MEMORANDUM**

**Padova, J.**                                                                **October 22, 2014**

Presently before the Court are two Motions filed by Boston Class Plaintiffs.  The first Motion seeks to re-transfer these two consolidated cases back to the United States District Court for the District of Massachusetts.[1]  The second Motion seeks leave to file a Fifth Amended Complaint ("FAC").  For the reasons that follow, both Motions are denied.

_____

[1]  The Boston area cases, which as currently pled raise allegations similar to those raised in an action concerning Comcast's alleged antitrust activities in the Philadelphia area, see Glaberson v. Comcast Corp., Civ. A. No. 03-6604 (E.D. Pa.), were transferred to this Court on January 16, 2007 from the United States District Court for the District of Massachusetts.

I.      **MOTION TO TRANSFER**

Title 28 U.S.C. § 1404 provides that a District Court may transfer any civil action to any other District where it might have been brought "[f]or the convenience of parties and witnesses, in the interest of justice. . . ."  28 U.S.C. § 1404(a).  In deciding whether transfer is appropriate, the court must weigh both "public interest" and "private interest" factors.  <u>Jumara v. State Farm Ins. Co.</u>, 55 F.3d 873, 879 (3d Cir. 1995).  The "private interests" established in <u>Jumara</u> include:

> [P]laintiff's forum preference as manifested in the original choice, the defendant's preference, whether the claim arose elsewhere, the convenience of the parties as indicated by their relative physical and financial condition, the convenience of the witnesses — but only to the extent that the witnesses may actually be unavailable for trial in one of the fora, and the location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum).

<u>Id.</u> (internal citations omitted).  The "public" interests identified in <u>Jumara</u> include:

> [T]he enforceability of the judgment, practical considerations that could make the trial easy, expeditious, or inexpensive, the relative administrative difficulty in the two fora resulting from the court congestion, the local interests in deciding local controversies at home, the public policies of the fora, and the familiarity of the trial judge with the applicable state law in diversity cases.

<u>Id.</u> at 879–80 (internal citations omitted).  Section 1404(a) "vest[s] district courts with broad discretion to determine, on an individualized, case-by-case basis, whether convenience and fairness considerations weigh in favor of transfer."  <u>Id.</u> at 883.

Plaintiffs contend that transfer is appropriate because the original transfer to this District was predicated upon the litigation of the <u>Glaberson</u> action.  Plaintiffs note that the Boston cases, which were consolidated with each other before they were transferred, and named the same defendants, were stayed by the Court in the District of Massachusetts pending the ultimate resolution of <u>Glaberson</u>.  Shortly after that stay order was entered, Plaintiffs sought transfer to this District, but the stay order was never lifted.  They assert that, "it was at that time in the interest of justice and convenience to transfer the cases to this Court to allow all three cases to be

determined in the same venue." (Pl. Transfer Mem. at 4.)  Plaintiffs assert that the "primary reason for transferring the Massachusetts cases to this Court no longer exists, warranting a transfer back to the original venue," because parties in the <u>Glaberson</u> case are allegedly attempting to reach a settlement.[2]  (<u>Id.</u>)  Specifically, they argue that Pennsylvania no longer has a significant interest in adjudicating the Boston cases; had it not been for the pendency of <u>Glaberson</u>, there would have been no legitimate reasons to bring them to Pennsylvania in the first place, and no reason remains for this Court to continue to bear the burden of adjudicating them.[3] (<u>Id.</u> at 5.)  Plaintiffs assert that Comcast will suffer no prejudice from the retransfer due to the fact that the Boston cases were stayed during their preliminary stages.  Finally, Plaintiffs' argue that the retransfer is in the interest of convenience of the parties and witnesses because all plaintiffs reside in Massachusetts; with <u>Glaberson</u> settling, adjudication of the state law claims in a foreign forum now creates inconvenience with no resulting benefits, including financial inconvenience since counsel for the Boston Plaintiffs are located in Boston.

Comcast responds that Plaintiffs' Motion to transfer the case back to the District of Massachusetts is a transparent attempt at forum-shopping.  The only purpose of the Motion, it asserts, is to give Plaintiffs the ability to start over with a new judge.  Comcast argues that the fact that the <u>Glaberson</u> plaintiffs are attempting a resolution of the their claims is irrelevant.  It notes that the original transfer motion that Plaintiffs filed, and successfully litigated in the District of Massachusetts, argued that transfer was appropriate because the federal antitrust

---

[2]  For purposes of the Motion to Transfer we merely note the Plaintiffs' assertion regarding the purported settlement activity.  No such settlement has been officially presented to the Court.  We express no opinion herein on any issue involving such a settlement.

[3]  Plaintiffs assert that Massachusetts retains a substantial interest in the adjudication because there are difficult issues of Massachusetts law to be decided, including unsettled questions about the availability of treble damages under Ch. 93A.  (Pl. Transfer Mem. at 6-7.) As we determine *infra* that the state law claims are futile, we reject this portion of the argument.

claims and the parallel claims under the Massachusetts Antitrust Act were '"based on the same facts and the same alleged conduct of defendants underlying plaintiffs' Sherman Act claims'" in Glaberson. (Def. Transfer Mem. at 3 (quoting Pls.' 2006 Transfer Mot. at 3, 6.).) This motion, it notes, was granted over Comcast's opposition.

Comcast asserts that the December 2006 decision to transfer the cases here is the law of the case and should not be re-litigated absent "unusual circumstances," such as new evidence or a change of law that was not previously available to the prior court. See Hayman Cash Register Co. v. Sorokin, 669 F.2d 162 (3d Cir. 1982); Holland, B.V. v. Consol. Rail Corp., Civ. A. No. 98-2694, 1998 WL 414722, at *1 (E.D. Pa. July 22, 1998) ("A transfer order from a coordinate court should only be reversed upon a showing of 'manifest error' or 'unusually circumstances.'"). It contends that such circumstances are absent here. The only change in circumstances, the possible settlement in Glaberson, it contends, does not warrant re-transfer, since it was Plaintiffs who originally wanted the Boston cases litigated here.

Comcast further argues that the Plaintiffs have failed to meet their burden of showing that the balance of factors favors transfer; they have failed to address most of the relevant factors; while they argue that they and their counsel are located in Boston, they ignore the fact that Comcast is headquartered in Philadelphia, the transactions at issue are national transactions that affected multiple markets and were negotiated in Philadelphia; they fail to identify any witnesses who would be inconvenienced; and whatever "difficult" questions of Massachusetts state law that exist did not dissuade Plaintiffs from originally seeking to transfer the case away from Massachusetts judges. Finally, Comcast argues that the assertion that it will suffer no prejudice from the transfer is wrong since the Plaintiffs themselves argued in the original transfer motion that litigation of claims related to the Philadelphia claims in the same forum would "avoid

duplicitous litigation, attendant unnecessary expense and loss of time to courts, witnesses and litigants and to avoid inconsistent results."  (Def. Transfer Mem. at 11 (quoting Pls.' 2006 Mot. to Transfer at 6-7).)   Plaintiffs also argued in 2006 that transfer was appropriate because discovery materials were located at Comcast's headquarters in Philadelphia.

Applying the <u>Jumara</u> "private" factors, it must be noted that Plaintiffs chose to transfer these cases to the Eastern District of Pennsylvania over Comcast's objection.  Their claims arose in Philadelphia when the swap transactions were negotiated and consummated here.  The only convenience argument Plaintiffs specifically assert is the convenience of their attorneys, not the convenience of witnesses.  Discovery documents are located in Philadelphia.  Most of the "public" factors — enforceability of the judgment, practical considerations that could make the trial easy, expeditious, or inexpensive, and the relative administrative difficulty in the two fora resulting from the court congestion — are not argued by Plaintiffs, who have the burden on the Motion.  Rather, they only address the factors of local interests in deciding local controversies at home, the public policies of the fora, and the familiarity of the trial judge with the applicable state law in diversity cases.

We conclude that the limited grounds raised by Plaintiffs on the private interests fail to tip the scale in favor of transfer, particularly given the history of the case, where Plaintiffs were the ones who sought to have the cases transferred away from their "home" district in contravention of these factors.  This abrogated Plaintiffs' original forum preference.  Whether or not the "primary reason for transferring the Massachusetts cases to this Court no longer exists," the pending request to transfer the case back to Massachusetts is unsupported by any substantial argument other than the convenience of Plaintiffs' counsel.  Accordingly, we conclude there is no sufficient basis to grant the Motion.

II.      **MOTION FOR LEAVE TO AMEND**

   A.      Standard of Review

   Granting leave to amend is within the discretion of the district court.  Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 330 (1971).  Courts should "freely give leave" for a party to file an amended pleading "when justice so requires."  Fed. R. Civ. P. 15(a)(2).  The United States Court of Appeals for the Third Circuit has stated that leave "must generally be granted unless equitable considerations render it otherwise unjust."  Arthur v. Maersk, Inc., 434 F.3d 196, 204 (3d Cir. 2006) (citing Foman v. Davis, 371 U.S. 178, 182 (1962)).  A court may deny leave to amend when "(1) the moving party has demonstrated undue delay, bad faith or dilatory motives, (2) the amendment would be futile, or (3) the amendment would prejudice the other part[ies]."  Lake v. Arnold, 232 F.3d 360, 373 (3d Cir. 2000); see also Lorenz v. CSX Corp., 1 F.3d 1406, 1414 (3d Cir. 1993) ("In the absence of substantial or undue prejudice, denial instead must be based on bad faith or dilatory motives, truly undue or unexplained delay, repeated failures to cure the deficiency by amendments previously allowed, or futility of amendment." (citation omitted)).  To determine futility, we apply the same analysis that would govern a motion to dismiss under Fed. R. Civ. P. 12(b)(6).  See In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1434 (3d Cir. 1997).  "'Futility' means that the complaint, as amended, would fail to state a claim upon which relief may be granted."  Id.  "If a proposed amendment is not clearly futile, then denial of leave to amend is improper."  Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, 6 Federal Practice and Procedure § 1487 (4th ed. 2010).

B.     The Consolidated Amended Class Action Complaint

The presently pending version of the Boston Complaint, the Consolidated Amended Class Action Complaint ("CACAC"), asserts per se and rule of reason theories under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Massachusetts Antitrust Act, M.G.L. c. 93, § 4, for horizontal market division (Count I); monopolization claims under Section 2 of the Sherman Act and Section 4 of the Massachusetts Antitrust Act (Count II); and attempted monopolization under Section 2 of the Sherman Act and Section 5 of the Massachusetts Antitrust Act, M.G.L. c. 93 § 5 (Count IV[4]).  (CACAC ¶¶ 68-107.)   The CACAC recounts the history of AT&T Corporation's ("AT&T") swap agreements with Charter Communications, Cablevision Systems Corporation and MediaOne Group, Inc. in the Boston cluster prior to AT&T's merger of its cable subsidiary with Comcast.  (Id. ¶¶ 55-56.)  Plaintiffs allege that, through the merger, Comcast became liable for AT&T's antitrust liability arising from the creation of the Boston cluster.  (Id. ¶ 58.)  They assert that the swap transactions in Boston eliminated actual and potential competitors, constituting an unreasonable restraint on competition for cable television services in the Boston cluster.  (Id. ¶¶ 60-61.)  The Boston Plaintiffs assert that the elimination of competition created a horizontal division of the market, suppressed competition, suppressed entry into the market by overbuilders and from former competitors that ceased or reduced their cable operations, and allowed Comcast to increase prices to supra-competitive levels.  (Id. ¶¶ 62-65.)

C.     The Proposed New Claims

In the proposed FAC, the Boston Class seeks to abandon all of its existing federal and state antitrust claims and substitute two Massachusetts state law claims based on two specific

---

[4]  There is no "Count III" in the CACAC.

swap transactions, namely a swap agreement between AT&T and Cablevision Systems Corp.,

and a swap transaction between AT&T and Charter Communications.  (FAC ¶ 39(a)(b).)  Count

I asserts a state law claim for the tort of conversion, alleging that:

> By using its illegally obtained monopoly power to overcharge Class members for
> non-basic cable television services, Comcast intentionally and wrongfully [took
> control] over Class members['] overpayments, to which Defendants had no right
> of possession.

(FAC ¶ 47.[5])  Count II alleges a violation of the Massachusetts Consumer Protect Act, M.G.L.

Ch. 93A, §§ 2, 9.

      D.    <u>Analysis</u>

          1.    <u>The Conversion Claim is Futile</u>

Massachusetts uses the definition of the tort of conversion found in the Restatement

Second of Torts § 222A.[6]  <u>See</u> <u>Verdrager v. Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C.</u>,

---

[5] The bracketed portions are missing from the allegation in Paragraph 47 in the FAC.  At oral argument, Plaintiffs' counsel indicated the allegation should read as quoted.   (<u>See</u> N.T. 10/16/14 at 14.)

[6] Section 222A provides:

(1) Conversion is an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel.

(2) In determining the seriousness of the interference and the justice of requiring the actor to pay the full value, the following factors are important:

      (a) the extent and duration of the actor's exercise of dominion or control;

      (b) the actor's intent to assert a right in fact inconsistent with the other's right of control;

      (c) the actor's good faith;

      (d) the extent and duration of the resulting interference with the other's right of control;

No. SUCV200904717C, 2013 WL 7760827, at *7 (Mass. Super. Ct. Dec. 17, 2013)   That Section defines conversion as "an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel."   Restatement 2d of Torts § 222A.   "The elements of conversion require that a [party] be proved to have 'intentionally or wrongfully exercise[d] acts of ownership, control or dominion over personal property to which he has no right of possession at the time. . . .'"   In re Brauer, 890 N.E.2d 847, 857 (Mass. 2008); see also Verdrager, 2013 WL 7760827, at *7 ("The basic premise of an action for conversion is that the actual owner is left without the ability to control its rightfully owned property.").

Money — such as the overpayments for cable television services Plaintiffs allege they paid due to Comcast's conduct, as distinguished from what is usually considered chattel, i.e., tangible personal property, — "can be the subject of a claim for conversion if the money is a specifically identifiable lot of money, which the defendant was obligated to keep intact or deliver."   Sweeney v. DeLuca, No. 042338, 2006 WL 936688, at *8 (Mass. Super. Ct. Mar. 16, 2006) (citing 53A Am.Jur. 2D Money § 21 (2005) (citing Garras v. Bekiares, 23 N.W.2d 239, 241 (Mich. 1946) (allowing claim for conversion where money is identifiable and defendant had obligation to return the specific money with which he was entrusted), U.S. Fid. & Guar. Co. v. Bass, 619 F.2d 1057, 1060 (5th Cir. 1980) (stating that "a cause of action may arise from conversion of specific money capable of identification"); and Teledyne Indus. Inc. v. Eon Corp., 373 F. Supp. 191, 202 (S.D.N.Y. 1974) (applying conversion claim to a "special account"))); see also Morrin v. Manning, 91 N.E. 308, 309 (Mass. 1910) (holding that, where constable seized

---

(e) the harm done to the chattel;

(f) the inconvenience and expense caused to the other.

money from plaintiff's cash register, the money seized was in excess of the debt constable was authorized to collect under a writ, and constable refused to return the excess, an action in trover would lie against constable to recover the excess since constable wrongfully took it for his own use and had no right of possession).

Where, however, a plaintiff's claim is "not for an identifiable lot of money that the moving party defendants were obligated to keep intact or deliver," there is no legally cognizable claim in Massachusetts for conversion because the claim does not "concern personal property." Sweeney, 2006 WL 936688, at *8; see also Murphy v. Wachovia Bank of Del., N.A., No. MICV200802070F, 2012 WL 1326642, at *5 (Mass. Super. Ct. Jan. 23, 2012) (holding that conversion theory of recovery does not extend to money owed on a debt or to "general damages") (citing Grand Pac. Fin. Corp. v. Brauer, 783 N.E. 2d 849, 857 (Mass. App. Ct. 2003)); accord Grande v. PFL Ins. Co., No. 9663, 2000 WL 1476676, at *4 (Mass. App. Ct. Sept. 27, 2000) (holding, in an action to recover premiums paid on a life insurance policy where plaintiff alleged she had been informed she was paying premiums toward a retirement annuity contract, that where the record was "devoid of any facts suggesting that [defendant] exercised any wrongful control over the monthly payments voluntarily made by [plaintiff], or took any action with respect to such payments other than providing her with the life insurance coverage which the documents establish that she purchased," there was no basis for a claim of conversion).

Courts have held that an identifiable "lot" or sum of money that has been wrongfully converted is a key element of the common law tort if it is premised upon a wrongful taking or control of money. Sweeney, 2006 WL 936688, at *8; see also Grand Pac. Fin. Corp., 783 N.E. 2d at 857 (stating that self-dealing by an escrow holder in its unauthorized collection from

escrowed funds of a debt owed by a party to the escrow agreement stated claim for conversion of the escrowed funds); accord Holt v. Denholm, No. G045496, 2014 WL 1666128, at *10 (Cal. App. Ct. Apr. 28, 2014) (stating that under California law, money "can be the subject of an action for conversion if a specific sum capable of identification is involved. . . .  On appeal, the Holts offer no arguments regarding the court's conclusion they failed to meet their burden of showing Biel possessed property the Trust or the Holts had an immediate right to possess or which was a *specifically identifiable* sum of money." (emphasis in original)); Singh v. PGA Tour, Inc., No. 651659/2013, 2014 WL 641311, at *9 (N.Y. Sup. Ct. Feb. 13, 2014) (under New York law, "[a]n action for conversion of money may be made out where there is a specific, identifiable fund and an obligation to return or otherwise treat in a particular manner the specific fund in question"); Health Commc'ns, Inc. v. Chicken Soup for the Soul Publ'n, Inc., No. X05CV084014539S, 2011 WL 2611826, at *6 (Conn. Sup. Ct. June 14, 2011) (holding that, under Connecticut law, "[m]oney can be the subject of [conversion]. . . . The plaintiffs must establish, however, legal ownership or right to possession of specifically identifiable moneys. . . . It must be shown that the money claimed, or its equivalent, at all times belonged to the plaintiff and that the defendant converted it to his own use. . . .  Thus, [t]he requirement that the money be identified as a specific chattel does not permit as a subject of conversion an indebtedness which may be discharged by the payment of money generally." (internal quotations and citations omitted); Gray v. Liberty Nat. Life Ins. Co., 623 So. 2d 1156, 1160 (Ala. 1993) (holding that, under Alabama law, an "action alleging conversion of cash lies only where the money involved is 'earmarked' or is specific money capable of identification, e.g., money in a bag, coins or notes that have been entrusted to the defendant's care, or funds that have otherwise been sequestered, and where there is an obligation to keep intact and deliver this specific money rather than to

11

merely deliver a certain sum."); <u>So. Cent. Bank & Trust v. Citicorp Credit Serv., Inc.</u>, 811 F. Supp. 348, 353 (N.D. Ill. 1992) (stating that money involved in suit could not be considered a specific chattel subject to a claim for conversion).

The "chattel" that was allegedly converted here is the "Class members' overpayments," to which Plaintiffs claim Defendant had no right of possession.  (FAC ¶ 47.)  We conclude that this allegation fails to state a claim for the tort of conversion as a matter of Massachusetts law. The Class does not identify a specific "lot" or sum of money that has been wrongfully converted. Plaintiffs allege no facts upon which it could plausibly claim that Comcast's billing receipts, irrespective of whether they included monopolistic overcharges, are a chattel that is still legally owned by Class members, and which Comcast was obligated to keep intact or deliver, but over which it improperly exercised dominion or control.   The factual allegations concerning Comcast's acquisition of the Boston cable cluster do not allege that Comcast's right of possession of the billing receipts was wrongful, in the sense that it took the property of another as its own; rather, the Class alleges only that the manner in which Comcast attained the ability to set the price for non-basic cable services was wrongful.  This is not a valid theory of conversion. Essentially, the Class seeks to transmogrify the money damages arising from an alleged antitrust injury into a claim for conversion of those money damages.   The clear authorities in Massachusetts require that we reject this attempt.  Because "general damages" cannot be considered "tangible property" that may be converted, <u>Murphy</u>, 2012 WL 1326642, at *5, and there is no "specifically identifiable lot of money, which the defendant was obligated to keep intact or deliver," <u>Sweeney</u>, 2006 WL 936688, at *8, the FAC's claim for conversion is not plausible.  Accordingly, leave to amend to include this claim is denied as futile.

2.    The Massachusetts Consumer Protection Act Claim is Futile

Count II attempts to state a claim under M.G.L. c. 93A, §§ 2 and 9.  Section 2 provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."  Section 9 provides for a civil action for any person "who has been injured by another person's use or employment of any method, act or practice declared to be unlawful by section two."  The Class alleges that the Chapter 93A claim is based on "Defendants' unfair or deceptive acts or practices in overcharging for cable television services."  (FAC ¶ 17.)  After making introductory allegations concerning the deregulation of the cable industry (id. ¶¶ 30-32), and the subsequent consolidation in the cable industry (id. ¶¶ 33-38), the Class specifically premises liability under Chapter 93A on Comcast's clustering scheme, including, an April 2000 swap between AT&T and Cablevision Systems Corporation of 357,850 Boston area cable subscribers.[7]  (Id. ¶ 39.)  The Class asserts that, as a result of clustering, "potential competitors were removed from Comcast's Boston cluster and Defendants were able to raise prices within Comcast's Boston cluster" because Comcast's conduct in engaging in the "transactions was unreasonably to restrain, suppress and eliminate competition for cable television service in Comcast's Boston, Massachusetts cluster."  (Id. ¶¶ 40-41.)  It was this

---

[7] The FAC also included an allegation concerning a December 1999 swap transaction between AT&T and Charter Communications involving 632,000 Boston area cable subscribers (the "Charter swap").  (FAC ¶ 39.)  In its Response, Comcast noted that, although the Charter swap was alleged in the FAC, the Class had previously acknowledged in the CACAC that the Charter swap was terminated on or about July 6, 2000, and never completed.  (Def. Resp. at 8 (citing CACAC at ¶ 55).)  At oral argument, Class counsel did not dispute that this transaction was never completed, asserting only that since AT&T's cable assets were later acquired by Comcast, "the AT&T swap in a sense has been consummated, because AT&T is now part of Comcast."  (See N.T. 10/16/14 at 5.)  Of course, if the Charter assets never became the property of AT&T, as affirmatively pled in the CACAC, they could not have become the property of Comcast via Comcast's later acquisition of AT&T's Boston cable properties.  Because the CACAC asserted that the transaction was never consummated and counsel does not dispute this fact, we ignore the Charter swap for purposes of this Motion.

alleged "conduct in imposing market and consumer allocations" that has allegedly permitted Comcast to increase "prices for cable programming services to artificially high, non-competitive levels. . . ."  (Id. ¶ 42.)

Comcast argues that the Chapter 93A claim is futile because the swap transaction relied upon by the Class was approved by regulators.  Section 3 of Chapter 93A provides that "[n]othing in this chapter shall apply to transactions or actions otherwise permitted under laws as administered by any regulatory board or officer acting under statutory authority of the commonwealth or of the United States."  M.G.L. c. 93A, § 3.  Comcast notes that, pursuant to 47 U.S.C. §§ 214(a) and 310(d),[8] the Federal Communications Commission must approve transfer of licenses between cable providers.  Comcast asserts, and the Class does not dispute, that the swap transaction cited in the FAC was approved by the FCC.[9]  See FCC Report No. SES-00260,

---

[8]  Section 214(a) provides in pertinent part that:

No carrier shall undertake the construction of a new line or of an extension of any line, or shall acquire or operate any line, or extension thereof, or shall engage in transmission over or by means of such additional or extended line, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity require or will require the construction, or operation, or construction and operation, of such additional or extended line. . . .  As used in this section the term "line" means any channel of communication. . . .

47 U.S.C. §  214(a).  Section 310(d) provides in pertinent part that "No construction permit or station license, or any rights thereunder, shall be transferred, assigned, or disposed of in any manner, voluntarily or involuntarily, directly or indirectly, or by transfer of control of any corporation holding such permit or license, to any person except upon application to the Commission and upon finding by the Commission that the public interest, convenience, and necessity will be served thereby.  47 U.S.C. §  310(d).

[9]  At oral argument, Plaintiffs' counsel conceded that "the approval documents say what they say," see N.T. 10/16/14 at 10, but asserted that Comcast may not rely on FCC regulatory approval of the transaction if it violated the terms of the approval by charging monopolistic prices.  We reject this assertion.  Plaintiffs themselves allege in the FAC that the FCC had no authority to review cable television rates at the time that the swap transaction was approved. (See FAC ¶ 32 (alleging the "FCC's authority to regulate the rates charged for non-basic cable

Feb. 7, 2001, at 7, available at https://apps.fcc.gov/edocs_public/attachmatch/DOC-209959A1.pdf (confirming the consummation of the Application for Consent to Transfer of Control from Cablevision of Massachusetts, Inc. to AT&T Corp).  It concludes that, because the transaction received regulatory approval, the Chapter 93A claim is futile.  The Class responds that Comcast has failed to show as a matter of law that the alleged overcharging falls within Section 3's exception because, "[r]egardless of whether government regulators approved the clustering that occurred here, Defendants do not — and cannot — argue that government regulators approved their overcharging for cable television services they provided."  (Pl. Reply at 7.)  We conclude that the claim is futile.

The Massachusetts courts have held that the burden is on the defendant to show that the exemption contained in Section 3 applies to the conduct in question.  <u>Cablevision of Boston, Inc. v. Pub. Improvement Comm'n of City of Boston</u>, 38 F. Supp. 2d 46, 61 (D. Mass 1999) (citing <u>Bierig v. Everett Square Plaza Assocs.</u>, 611 N.E.2d 720, 728 n.14 (Mass. App. Ct. 1993)).  "The burden is a difficult one to meet."  <u>Bierig</u>, 611 N.E.2d at 728 n.14 (internal quotation omitted); <u>Commonwealth v. Fremont Inv. & Loan</u>, 897 N.E.2d 548, 561 (Mass. 2008).  To fall within the exception "a defendant must show more than the mere existence of a related or even overlapping regulatory scheme that covers the transaction.  Rather, a defendant must show that such scheme affirmatively <i>permits</i> the practice which is alleged to be unfair or deceptive.'"  <u>Bierig</u>, 611 N.E.2d at 728 n.14 (emphasis in original; internal quotation marks omitted); <u>Fremont Inv. & Loan</u>, 897 N.E.2d at 561 (quoting <u>Bierig</u>).  Although the burden is high, the allegations of the

---

programming . . . was terminated for services provided after March 31, 1999.  Therefore, the rates charged for such cable services are determined by the cable companies themselves.").)  Accordingly, the prices Comcast charged after the creation of the cluster could not, as a matter of law, have violated the terms of the approval.

FAC show that liability is premised upon Comcast's clustering conduct, which indisputably received governmental approval.

In response to Comcast's arguments, the Class seeks to distinguish the creation of the cluster from the act of charging monopolistic prices, asserting that the "unfair or deceptive acts or practices in the conduct of any trade or commerce" was the overcharge.  They argue that, while regulators might have approved the creation of the cluster, they did not approve Comcast's prices.  We find this argument meritless since it ignores the central factual allegation pled in the FAC:  the ability to charge monopolistic prices is alleged to be a direct result of the clustering activity.  (See FAC ¶ 40 ("As a result of such 'swapping' agreements and transactions, potential competitors were removed from Comcast's Boston cluster and Defendants were able to raise prices within Comcast's Boston cluster."); ¶ 42 ("Defendants' conduct in imposing market and consumer allocations in the manner alleged in this Complaint has had the following effects, among others: . . .  Comcast has increased prices for cable programming services to artificially high, non-competitive levels. . . .")).  Since the transactions that created the cluster were approved by regulators, the regulatory scheme "affirmatively permit[ed] the practice which is alleged to be unfair or deceptive."  Bierig, 611 N.E.2d at 728 n.14 (emphasis omitted).  Thus, the Class's attempt to state a claim under Chapter 93A is futile because the exception contained in Section 3 applies.[10]

---

[10]  Moreover, the Class concedes that, pursuant to 47 U.S.C. § 543(a)(1), Congress has provided that no "state or local entity has the authority to review rates for such cable services or to investigate allegations that such rates are excessive."  (FAC ¶ 32.)  Accordingly, any attempt by the Class to assert a state law claim under Chapter 93A alleging that Comcast's rates are excessive would be expressly preempted.  See generally Arizona v. United States, ___U.S. ___, 132 S. Ct. 2492, 2500-01 (2012) ("The Supremacy Clause provides a clear rule that federal law 'shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.'  Art. VI, cl. 2.  Under this principle, Congress has the power to preempt state law. . . .  There is no doubt that

3.      Undue Delay

In addition to attempting to state futile claims, the Class's undue delay in seeking to add the two new claims justifies denial of the Motion.  "Delay 'becomes "undue," and thereby creates grounds for the district court to refuse leave [to amend], when it places an unwarranted burden on the court or when the plaintiff has had previous opportunities to amend.'"  Goldfish Shipping, S.A. v. HSH Nordbank AG, 623 F. Supp. 2d 635 640 (E.D. Pa. 2009) (quoting Bjorgung v. Whitetail Resort, LP, 550 F.3d 263, 266 (3d Cir. 2008)).  Comcast argues that the case was actively litigated for four years prior to imposition of the stay, and the Class was not diligent in seeking to add the new claims at any time prior to the April 30, 2007 deadline imposed by the United States District Court for the District of Massachusetts for filing amended pleadings.  (Def. Resp. at 11 (citing D. Mass. Docket Entry 100 at ¶ 6).)  It also argues that the Class, having already twice amended its pleadings, should not be permitted to do so again when the two new theories are based on the same factual allegations previously pled.  (Id. at 11-12.)  It contends that the Class seeks to add the new theories at this late stage only now that the currently propounded theories have been rendered questionable by the Supreme Court's decision in Glaberson.  The Class responds that, although the case was pending in Massachusetts for four years, a substantial portion of the time was devoted to an interlocutory appeal to the United States Court of Appeals for the First Circuit over the scope of an arbitration clause in Plaintiffs' cable subscription agreement.  (Pl. Reply at 4.)

We conclude that Comcast's undue delay argument is meritorious.  Even if we accept that litigating the arbitration issues occupied a substantial portion of the parties' efforts while the

Congress may withdraw specified powers from the States by enacting a statute containing an express preemption provision." (internal case citations omitted)).

case was pending in Massachusetts, the factual basis of the new claims is identical to that of the claims originally propounded, and the Class makes no cogent argument why it failed to assert the new theories in a timely manner.   As we have stated previously, if a plaintiff has viable alternative theories of recovery, it is obligated to present those theories to the Court and should not be permitted to present them seriatim as the conduct of the litigation renders the original choice of theory problematic.   Goldfish Shipping, S.A., 623 F. Supp. 2d at 641.   Moreover, we see no basis why the litigation over the scope of the arbitration clause created an impediment to Plaintiffs' ability to file the proposed amendment within the time period provided by the Massachusetts court.[11]

An appropriate Order will be entered denying both pending Motions and dismissing these actions with prejudice.[12]

BY THE COURT:

/s/ John R. Padova

_____

John R. Padova, J.

---

[11]   Having determined that the two claims contained in the FAC are futile and that the delay in asserting them was undue, we do not need to reach Comcast's other arguments in opposition to the Motion for leave to amend.

[12]   At oral argument on the Motion for leave to file the FAC, Plaintiffs' counsel informed the Court that, should the Motion be denied, Plaintiffs would not continue to litigate the antitrust claims contained in the CACAC.  Rather, they would consent, without objection from Comcast, to the entry of an order dismissing the two cases with prejudice, so that they could effectuate an immediate appeal.  (See N.T. 10/16/14 at 3; 14; 24.)